**Robert P. McGRAW, Respondent,**

v.

**Wilmer C. ANDES, Defendant,**

**A.L. Thompson, Sr. & ATM Corporation, Appellants.**

**No. WD 54518.**

Missouri Court of Appeals, Western District.

Submitted July 16, 1998.

Decided Nov. 3, 1998.

Theodore C. Beckett, II, Kansas City, for appellants.

Michael M. Tamburini, Kansas City, for respondent.

Before SMART, P.J., and ELLIS and HOWARD, JJ.

PER CURIAM.

This case involves an action commenced by a former officer and shareholder of a development corporation. Robert P. McGraw, plaintiff, contends that the corporation and the other principals in the corporation breached various agreements. The claims arose out of the development and construction of a large condominium complex in Independence, Missouri. A.L. Thompson and ATM Corporation appeal the trial court's rulings on after-trial motions. The orders of the trial court are affirmed in part and reversed in part.

## Factual Background

Although the appellants' brief is not easy to read, our efforts to understand the facts have yielded the following factual information underlying this litigation.[1] On June 5, 1991, A.L. Thompson, Michael L. Andes and Wilmer C. Andes formed ATM Corporation ("ATM"). ATM is the developer and operator of Apple Tree Manor Condominiums in Independence, Missouri. The three men planned four successive phases of thirty units each. The units were to be constructed by Speed Oil Co., a corporation of which Wilmer Andes was the president and sole principal. Mr. Thompson was not involved in the day-to-day operation of ATM. He and his wife, Eileen, appointed Robert P. McGraw, a retired dentist, as their agent in proxy to vote their shares.

After he had obtained a loan on behalf of ATM, McGraw was elected a director, Chief Executive Officer, Chief Financial Officer and President of ATM on November 25, 1991. Both McGraw and his wife, Cicely, personally guaranteed loans made by First City Bank ("the Bank") on Phases I and II of the project. These loans were both in excess of two million dollars. McGraw also became a shareholder of the corporation. At this time, Thompson and McGraw held the same percentage of shares in ATM and together they held majority interest in ATM. McGraw also served as trustee of the stock owned by Wilmer Andes and Michael Andes, who wished to avoid registering their stock in their own names. Also on November 25, 1991, Thompson, Wilmer Andes, Michael Andes and McGraw entered into a shareholders agreement (see "Appendix A"). At the time they entered into the agreement, these four individuals were the shareholders and directors of ATM.

The construction of Apple Tree Manor proceeded in two phases. The first phase began in late 1991 or early 1992. In April, 1992, the foundation piers for the first building settled because they had been placed upon mud. As a result of problems with the construction of Phase I, Wilmer Andes was relieved of his construction duties and Otis Baker was brought in as the project supervisor at this time. Correcting the foundation difficulties cost over $300,000.00 and delayed the project two or three months.

Before the Bank would agree to loan money to ATM for Phase II, it required that a certain number of units be sold in Phase I. The Bank made it clear that the units must be sold outright. At their June 6, 1992 meeting, the directors of ATM discussed the possible purchase of two units. Neither Thompson nor Wilmer Andes were willing or able to buy the units. Thompson proposed that he take ownership of two units in exchange for a lessening of ATM's debt to him but this was

---

1. In what was perhaps an attempt to comply with the page limitations found in Rule 84.04(i), the appellants have presented us with many footnotes full of unnecessary and tedious detail. A better way to comply with the page limitation would have been to reduce the brief by omitting unnecessary detail and repetition. Also, again apparently to reduce the size of the brief, appellants identify all of the players by initials, rather than by name or capacity, throughout the brief. Part of the length of the brief is due to the fact that in citing to the record, counsel invariably lists every page of the transcript on which a fact appears, even if the fact is not disputed and even if the fact is referred to thirty times in the transcript. Transcript citations are necessary; however, some judgment is appropriate in determining how many transcript references to string together. We do not fault appellants for their effort, but appellants' brief was extremely difficult to read. A brief could be so difficult to read that it preserves nothing for appeal.

not acceptable to the Bank. McGraw offered to purchase two units and finance them with an outside loan. A total purchase price of $207,900.00 was established, using the current cost sheet for the units. The proceeds realized from the sale of the units to McGraw were used to pay ATM's loan balance with the Bank.

The company had been doing business out of the basement of Wilmer Andes' home and at a trailer at the construction site, paying Wilmer Andes $2,400.00 per month for this privilege. ATM had been informed by the City of Lee's Summit that it could no longer use Wilmer Andes' basement as an office. Because ATM needed an office and a sales model unit, the McGraws leased the two units they had bought back to ATM. Unit 101 was used as a sales model until the next phase was constructed, and Unit 105 was used as the corporation's office.

McGraw leased Unit 105 to ATM on May 15, 1993. The lease agreement called for rent of $1,200.00 to be paid monthly. The term of the lease was five years, from May 15, 1993 through May 31, 1998. The agreement required that Mr. McGraw be given six months' notice of termination or abandonment. ATM quit the lease in January 1995 without prior notice. McGraw claimed that the total amount owed him for rent and for repairs was $33,601.15.

McGraw had also previously entered into an oral agreement with ATM whereby he loaned the corporation money for out-of-pocket expenses. ATM's books, as of December 31, 1994, showed a current liability to McGraw of $191,021.69. The ATM shareholders' agreement (see "Appendix A") memorializes the oral loan agreement, providing that "[t]he parties hereto shall be reimbursed for actual out-of-pocket expenses necessarily incurred by them in connection with the Project." All four shareholders, McGraw, Wilmer Andes, Michael Andes and Thompson, signed the shareholders' agreement. McGraw testified that the company had established a running account for the out-of-pocket expenses that he had incurred. He advanced thousands of dollars to ATM on his personal credit card and at one point, took out a second mortgage on his home to pay contractors who worked for ATM. There was evidence that these out-of-pocket expenses had been discussed by the other members of the corporation and that Thompson had assured McGraw that the loan would be paid. Additionally, there was evidence that the advances made by McGraw protected Thompson's letter of credit and allowed the project to continue.

McGraw also leased his warehouse to ATM. The shareholders' agreement contained the following:

Building Lease. ATM will lease Bob's building at 315 North Main, Independence, for storage and warehousing purposes for which ATM will pay Bob $3,000.00 per month rent, commencing November 1, 1991, continuing until the first four phases of construction are completed. Such payments will be treated as Project Costs.

ATM stored electrical transformers and other miscellaneous items in the warehouse at times. According to ATM, the payments made pursuant to the lease of the warehouse were actually disguised compensation for McGraw's services to ATM. ATM had made a series of rent payments to McGraw on the warehouse. According to the bookkeeper, the payments were part of "soft draw requests" and coded as rent. McGraw received $61,700.00 in rent payments. At the time of trial, McGraw claimed that $127,300.00 was owed to him under the warehouse lease.

In late 1994, the Bank decided not to renew the loan. ATM scheduled a special shareholders meeting on December 20, 1994. Prior to the December 20 meeting, Thompson called McGraw and told him that if he had to buy the loan, he wanted control of the corporation. McGraw agreed to give Thompson twenty-one percent of his stock, and Mrs. McGraw agreed to give him stock in consideration of a release of the McGraws' guaranty on the loan. At this meeting, McGraw was removed from the board of directors and removed as president without explanation. There was evidence that until the time he was terminated, McGraw had received no complaints on his performance at ATM, but instead had been commended many times. The evidence shows that McGraw had devot-

ed many long hours to the success of ATM and that Apple Tree Manor was regarded as a quality development. Mr. Baker, the project supervisor, and Mr. Constance, the attorney, were terminated at the same time as McGraw. On January 5, 1995, Thompson purchased the Bank's loan to ATM for $2,397,000.00. At the time of trial, McGraw was a minority shareholder in the company.

## Procedural Background

### Mr. McGraw's Suit

On April 7, 1995, McGraw filed suit against Wilmer Andes, Thompson and ATM corporation. McGraw brought his suit both in his individual capacity and as a shareholder of ATM. Count I of the petition states a claim against Wilmer Andes for breach of the oral loan agreement and claims he loaned Wilmer Andes $24,544.55 which has not been repaid. Count II states a cause of action for breach of the warehouse lease. Count III was a claim for breach of lease in regard to the condominium. Count IV alleges a breach of the shareholder agreement, in which McGraw claims that the defendants agreed that he would be entitled to serve on the ATM board of directors, that he would be paid $3,000.00 per month for use of his warehouse, that Wilmer Andes would acknowledge McGraw's $18,000.00 loan, that McGraw and his wife would guarantee the $2.3 million dollar bank loan, and that McGraw would receive thirty percent of outstanding ATM stock. He claims that Andes promised that the corporation would make a $4,000,000.00 profit and that McGraw would make in excess of $1,000,000.00. McGraw alleges that this agreement was breached and that he was damaged in an amount exceeding $1,000,000.00. In Count V, McGraw alleges that ATM breached the oral loan agreement by failing to repay him the sum of $105,-000.00. Count VI is a derivative count for breach of a construction contract.

### The Defendants' Counterclaims

ATM Corporation alleges in counterclaims that McGraw negligently and intentionally breached his fiduciary duties. ATM alleges, *inter alia*, that McGraw awarded subcontracts to contractors who were his friends; awarded subcontracts on the basis of the lowest bid without regard to substance or quality; and improperly engaged in unfair self-dealing transactions in the lease of McGraw's warehouse, the purchase of two condominium units, the lease of the units to ATM, and the conversion of materials belonging to ATM for his own use. ATM also states a claim in conversion, alleging that Mr. McGraw converted property belonging to ATM by taking materials used in the construction of the condominiums and used that property to construct or repair his lake home; that he included an extra pallet of shingles that he used upon his own home; that he ordered additional glass sliding doors and installed them in a home he owned, that he ordered plumbing work done for his warehouse; and that he ordered electrical fixtures for his own home.

### The Verdict

The matter was tried to a jury beginning February 3, 1997. Forty jury instructions and 12 verdict directors were submitted to the jury. Following six days of trial, the jury returned verdicts A through L depicted below:

| Verdict | Claim/Counter claim | Prevailing Party | Amount |
|---|---|---|---|
| Verdict A | Claim of Oral Loan Agreement for $18,000 against Andes | Defendant Andes | N/A |
| Verdict B | Claim of Oral Loan Agreement for $6,544.55 against Andes | Plaintiff McGraw | $ 2,500 |
| Verdict C | Claim of Breach of Warehouse Lease against ATM | Plaintiff McGraw | $127,300 |
| Verdict D | Claim of Breach of Warehouse Lease against Andes | Defendant Andes | N/A |

| Verdict | Claim/Counter claim | Prevailing Party | Amount |
|---|---|---|---|
| Verdict E | Claim of Breach of Warehouse Lease against Thompson | Defendant Thompson | N/A |
| Verdict F | Claim of Breach of Warehouse Lease against Speed Oil | Defendant Speed Oil | N/A |
| Verdict G | Claim of Breach of Unit 105 Lease against ATM | Defendant ATM | N/A |
| Verdict H | Claim of Oral Loan Agreement against ATM | Defendant ATM | N/A |
| Verdict I | Claim of Breach of Unit 105 Lease against Andes | Defendant Andes | N/A |
| Verdict J | Claim of Breach of Unit 105 Lease against Thompson | Defendant Thompson | N/A |
| Verdict K | Claim of Breach of Construction Contract against Andes | Defendant Andes | N/A |
| Verdict L | Counterclaim of Breach of Fiduciary Duties against McGraw | Defendant-counter-claimant ATM | $207,000 $129,800 |

On February 14, 1997, the trial court entered judgment on the jury's verdicts. On March 14, ATM filed a motion for new trial as to the $127,300 judgment in favor of McGraw on his claim against ATM for breach of the warehouse lease. ATM claimed that the verdict on this count was not supported by substantial evidence and was against the weight of the evidence. ATM based its motion for new trial on the following: (1) that the rental payments for McGraw were salary for his service as president and his termination consequently ended the payments; (2) that McGraw's claim was void because the lease violated § 351.327, RSMo 1994; (3) that McGraw's claim was void under the terms of the shareholders' agreement; (4) that the claim was barred because of McGraw's breach of fiduciary duty; and (5) that the claim was barred because of a failure of consideration, failed to state a claim upon which relief could be granted, was not proven and was barred by laches, waiver and estoppel.

On March 17, 1997, McGraw filed his motion for Judgment Notwithstanding the Verdict ("JNOV") or in the alternative, motion for a new trial. In this motion McGraw suggested that the trial court erred by denying his motion for a directed verdict at the close of all of the evidence because: (1) the defendants did not controvert the overwhelming evidence with respect to certain of McGraw's claims against ATM; (2) ATM failed to plead a claim for the actual damages awarded by the jury; and (3) defendant ATM did not make a submissible claim upon its counterclaim. McGraw requested:

[T]hat this Court set aside the jury's verdict on Dr. McGraw's claims for breach of loan agreement against Mr. Andes and on his claims against ATM for breach of loan agreement and breach of lease agreement, and that the Court enter judgment in favor of Dr. McGraw on each of these claims, and that the Court set aside the jury's verdict on ATM's counterclaim for actual and punitive damages, and that the Court enter judgment in favor of Dr. McGraw on such counterclaim, or in the alternative, grant a motion for new trial.

On June 12, 1997, the trial court entered its order. The court: (1) sustained McGraw's motion and entered judgment notwithstanding the verdict in favor of McGraw for $18,000.00 against Andes on McGraw's claim for breach of the oral loan agreement (Verdict A); (2) allowed Verdict B, Verdict D, Verdict E, Verdict F, Verdict I, and Verdict K stand; (3) denied ATM's motion for new trial on the verdict in favor of McGraw on the breach of the warehouse lease (Verdict C); and (4) granted a new trial on the ground that the verdicts were against the

weight of the evidence as to McGraw's claim against ATM for the breach of the office lease agreement (Verdict G), McGraw's claim against ATM for the breach of the loan agreement (Verdict H), McGraw's claim against Mr. Thompson for breach of the loan agreement (Verdict J) and ATM's counterclaim for breach of fiduciary duty (Verdict L). This is illustrated as follows:

| Verdict | Claim/Counter claim | Prevailing Party | Amount | Post–Trial Action of Trial Court |
|---|---|---|---|---|
| Verdict A | Claim of Oral Loan Agreement for $18,000 against Andes | Defendant Andes | N/A | JNOV granted |
| Verdict B | Claim of Oral Loan Agreement for $6,544.55 against Andes | Plaintiff McGraw | $ 2,500 | Allowed to stand |
| Verdict C | Claim of Breach of Warehouse Lease against ATM | Plaintiff McGraw | $127,300 | Allowed to stand |
| Verdict D | Claim of Breach of Warehouse Lease against Andes | Defendant Andes | N/A | Allowed to stand |
| Verdict E | Claim of Breach of Warehouse Lease against Thompson | Defendant Thompson | N/A | Allowed to stand |
| Verdict F | Claim of Breach of Warehouse Lease against Speed Oil | Defendant Speed Oil | N/A | Allowed to stand |
| Verdict G | Claim of Breach of Unit 105 Lease against ATM | Defendant ATM | N/A | New trial granted |
| Verdict H | Claim of Oral Loan Agreement against ATM | Defendant ATM | N/A | New trial granted |
| Verdict I | Claim of Breach of Unit 105 Lease against Andes | Defendant Andes | N/A | Allowed to stand |
| Verdict J | Claim of Breach of Unit 105 Lease against Thompson | Defendant Thompson | N/A | New trial granted |
| Verdict K | Claim of Breach of Construction Contract against Andes | Defendant Andes | N/A | Allowed to stand |
| Verdict L | Counterclaim of Breach of Fiduciary Duties against McGraw | Defendant-counter-claimant ATM | $207,000 $129,800 | New trial granted |

ATM and Thompson appeal the order of the trial court.

### Breach of the Oral Loan Agreement by Mr. Thompson

■ Appellants, in Point I, contend that the trial court erred in granting McGraw a new trial on Verdict J, for breach of the oral loan agreement, because Verdict J was against the weight of the evidence. The appellants claim that the trial court was without jurisdiction to grant a new trial because the order granting the new trial was issued more than thirty days after the entry of judgment and McGraw did not request relief from the judgment entered on Verdict J.

Specifically, Verdict J was rendered in favor of Thompson on McGraw's claim that Thompson breached the oral loan agreement. Although McGraw's post-trial motion for JNOV or new trial asserted that the trial court erred in denying his motion for directed verdict, McGraw did not ask the court for relief from any verdict concerning Thompson. McGraw requested that the court set aside the verdict, on McGraw's "claims for breach of loan agreement against Mr. Andes and on his claims against ATM for breach of loan agreement and breach of lease agreement, and that the Court enter judgment in favor of Dr. McGraw on each of these claims." McGraw claimed that the verdicts on his claims against ATM were against the weight of the evidence, specifically referring to a breach of the loan agreement by Wilmer Andes and ATM and a breach of the office lease agreement. McGraw also challenged the verdict on ATM's counterclaim. The motion makes no mention of error in connection with McGraw's claim against Thompson.

■ Rule 75.01 permits the trial court, within thirty days after entry of judgment, to grant a new trial on its own initiative. After this thirty-day period has passed, the trial court's authority to grant a new trial is limited to grounds raised in timely-filed after-trial motions. *State ex rel. Missouri Highway & Transp. Comm'n v. Christie*, 855 S.W.2d 380, 382 (Mo.App.1993). This includes the discretionary ground that the verdict was against the weight of the evidence. *See Sondergard v. Kansas City Power & Light Co.*, 826 S.W.2d 20, 22 (Mo.App.1992).

In the instant case, judgment was entered on February 14, 1997. The trial court issued its order for new trial on June 12, 1997, clearly outside the thirty-day limit. The trial court had no jurisdiction to grant a new trial more than thirty days after it entered judgment on the jury's verdict based on the grounds that the verdict in favor of Thompson was against the weight of the evidence because that claim was not presented in McGraw's motion. Appellants' Point I is granted. The order granting McGraw a new trial on the claim resolved in verdict J is a nullity. Consequently, this part of the trial court's order is reversed and the judgment on that claim, as originally rendered, is given full force and effect.

### Breach of the Unit 105 Lease

In Point II, the appellants claim that the trial court erred in ordering a new trial on McGraw's claim against ATM for breach of the lease agreement on Unit 105 because the verdict was against the weight of the evidence. The appellants contend that McGraw did not make a submissible case because the claim was not supported by substantial evidence, and the verdict was against the weight of the evidence. They argue that the claim was barred as a matter of law because § 351.327 requires authorization or approval before McGraw's self-dealing on the lease. They further claim that the law will not recognize a contract entered into by McGraw with himself, and that McGraw's breach of fiduciary duties created a constructive trust in favor of ATM.

■ We begin by reviewing the standard under which we evaluate this point. The trial court has great discretion where it grants a new trial on the ground that the verdict is against the weight of the evidence. *Simpkins v. Ryder Freight Sys., Inc.*, 909 S.W.2d 683, 685 (Mo.App.1995). Such an order granting a new trial is presumed correct, and we will not disturb that order unless the trial court manifestly abused its discretion. *Id.* "Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Anglim v. Missouri Pac. R.R.*, 832 S.W.2d 298, 303 (Mo. banc 1992). It cannot be said that the trial court abused its discretion where reasonable persons could differ over the propriety of its ruling. *Id.* As long as the plaintiff has made a submissible case, that discretion is "virtually unfettered." *Brown v. Lanrich,*

*Inc.,* 950 S.W.2d 235, 237 (Mo.App.1997). No abuse of discretion will be found where substantial evidence exists to support a verdict in the moving party's favor. *Robertson v. Cameron Mut. Ins. Co.,* 855 S.W.2d 442, 446 (Mo.App.1993). We indulge every reasonable inference in favor of the trial court's ruling. *Hacker v. Quinn Concrete Co.,* 857 S.W.2d 402, 415 (Mo.App.1993). We are more liberal in upholding the trial court's grant of a new trial than we are where the motion for new trial has been denied. *Nguyen By & Through Nguyen v. Haworth,* 916 S.W.2d 887, 888 (Mo.App.1996).

The appellants contend that Dr. McGraw failed to make a submissible case on Verdict G, the verdict relating to McGraw's claim that ATM breached its lease for Unit 105. They contend that as a matter of law, McGraw's claim was barred because: (1) it was in violation of § 351.327, RSMo 1994; (2) Mr. McGraw could not enter into a contract with himself; and (3) Mr. McGraw breached his fiduciary duty to ATM.

■■■■ We examine the record to determine whether or not McGraw made a submissible case on his breach of contract claim. In order to make a submissible case, it is incumbent on the plaintiff to present substantial evidence supporting each element of his claim. *Spring v. Kansas City Area Transp. Auth.,* 873 S.W.2d 224, 225 (Mo. banc 1994). In Missouri, a lease is acknowledged as having a dual character: it is both a conveyance and a contract. *See King v. Moorehead,* 495 S.W.2d 65, 75 (Mo.App. 1973). The general rules of contract construction are used in construing a lease. *Howe v. ALD Servs., Inc.,* 941 S.W.2d 645, 650 (Mo.App.1997). Accordingly, all provisions of the contract are to be given effect and the contract should be given a reasonable construction. *Id.* at 650–51. In order to make a submissible case on a claim of breach of contract, the party alleging the breach must prove: (1) the existence of a valid contract; (2) the rights and obligations of each party; (3) a breach; and (4) damages. *Id.* at 650. Every fact essential to liability must be supported by substantial evidence. *Id.*

■■■■ The appellants contend that as a matter of law, McGraw failed to present substantial evidence on the first element because no valid contract existed between the parties. Appellants assert that the contract violated § 351.327, RSMo 1994 and that McGraw's dealings with ATM were unlawful. In making these arguments the appellants are essentially asking us to weigh the evidence presented to the trial court. This we will not do. We hold that Mr. McGraw made a submissible case on his claim that ATM breached its lease with him.

■■■■ McGraw presented evidence that the contract he entered into with ATM was valid. Section 351.327 does not require a contrary result. That section states that a transaction between a corporation and one of its directors or officers is not void or voidable if: (1) the material facts of the director's interest are known to the board of directors, and the board of directors authorizes the contract by an affirmative vote of the majority of disinterested directors; (2) the material facts of the director's interest are known to the shareholders, and the shareholders entitled to vote thereon specifically approve the contract by vote; or (3) the contract is fair to the corporation at the time it is authorized or approved by the board or the shareholders. The statute does not make such a contract unenforceable and invalid as is claimed by the appellants. Rather, it makes such a contract "void or voidable" if certain conditions are not met.

Although there is no evidence that the lease was formally approved by the board or by the shareholders, McGraw presented evidence that the lease had been approved by the others involved who together, constituted all of the shareholders in the corporation. McGraw discussed the lease with Thompson and Thompson stated that he did not care what McGraw did. Rent was paid pursuant to the lease using draw requests co-signed by

Wilmer Andes. The office lease agreement was prepared by ATM's bookkeeper, Wanda Nalivaiko, and ATM dutifully made monthly payments on the lease until McGraw was discarded by the corporation.

McGraw also presented evidence that the lease was fair to the corporation, including evidence that the rent the company paid on the unit was less than half the rent it paid to Wilmer Andes for the use of his basement and job-site construction trailer.

Appellants claim that McGraw could not enter into a contract with himself and that he breached his fiduciary duties to the company. They base this claim upon *People's Bank of Butler v. Allen*, 344 Mo. 207, 125 S.W.2d 829, 831 (Mo.1939) which does indeed state that a person cannot enter into an agreement with himself. Appellants' argument ignores both § 351.327 effectively acknowledging such transactions, and Missouri case law holding the contrary. The prohibition against a director of a company conducting personal transactions with the company was moderated by *Ramacciotti v. Joe Simpkins, Inc.*, 427 S.W.2d 425 (Mo.1968). That case states:

> Where it appears that a director or officer has obtained any personal profit from dealing with the corporation, and the transaction is drawn into question as between him and the stockholders of the corporation, the burden is upon the director or officer to show that the transaction has been fair, open and in the utmost good faith. *Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425. These rules apply equally as well where the director or officer has acted in his dealings with the corporation through another corporation of which he is the principal owner or is in control, *Corsicana National Bank of Corsicana v. Johnson*, 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141, and especially is this true where a common director or officer is dominating in influence or in character. *Geddes v. Anaconda Copper Mining Co., supra*. However, these rules are subject to certain qualifications. The relation

alone of a director or officer of a corporation does not prevent the director or officer from doing business with the corporation at a profit. *Swafford v. Berry, supra* [152 Colo. 493, 382 P.2d 999]. The prohibition encompassed in the above general rules is directed at unconscionable and secret profits. *Bromschwig v. Carthage Marble & White Lime Co., supra* [334 Mo. 319, 66 S.W.2d 889].

*Id.* at 431–32. The teaching of *Ramacciotti* has not been abandoned. For example, in *Preferred Physicians Mut. Management Group v. Preferred Physicians Mut. Risk Retention*, 918 S.W.2d 805, 811 (Mo.App. 1996) we held that it was not a *per se* breach of one's fiduciary duty to maintain dual roles in a corporate business relationship. In *Scott v. Potter Plumbing & Heating, Inc.*, 596 S.W.2d 492, 494 (Mo.App.1980) the court acknowledged that it is "well settled" in Missouri that the incorporators, stockholders, directors or officers of a corporation may lawfully lend money to a corporation. Such transactions presuppose that a corporate officer may well be contracting with himself in different capacities.

There was evidence that McGraw purchased the units solely to benefit the company because the Bank required a certain number of units be sold before financing would be continued. Moreover, the leases that McGraw entered into with the company for Units 101 and 105 could have been found to have been fair under the evidence presented at trial. These transactions were neither shrouded in secrecy nor carried out in defiance of or with the disapproval of the other shareholders. We decline the invitation to weigh the evidence anew or to resolve conflicts in the evidence. Our purpose is solely to determine whether Dr. McGraw made a submissible claim for breach of contract by showing: (1) the existence of a valid contract; (2) the rights and obligations of each party; (3) a breach; and (4) damages. *Howe*, 941 S.W.2d at 650. Dr. McGraw has done so. We do not find as a matter of law that Dr. McGraw's claim is barred. Therefore, we

uphold the trial court's grant of a new trial to Dr. McGraw on the grounds that the verdict was against the weight of the evidence. Point II is denied.

## Breach of Oral Loan Agreement by ATM

■ Appellants next claim that the trial court erred in granting a new trial on McGraw's claim that ATM breached the oral loan agreement. They claim that McGraw failed to prove the existence of such an agreement by substantial evidence and also that the claim was barred pursuant to § 351.327.

In his petition, McGraw claimed that he entered into an oral agreement with ATM whereby he loaned ATM money for certain out-of-pocket expenses, and ATM failed to repay the loan. He submitted his claim to the jury, claiming that ATM owed him $191,021.69. This figure was based upon ATM's own financial statements. Evidence was presented through the testimony of McGraw and other witnesses that Mr. Thompson assured McGraw that ATM would repay the advances McGraw made to ATM. McGraw presented evidence that there was a loan agreement, the terms of that loan agreement, a breach of that agreement and damages.

The appellants advance many of the same arguments previously discussed. Once again, we decline to weigh the evidence presented to the trial court. In accordance with our prior analysis, we find that the loan agreement was not barred by § 351.327 or the fact that McGraw acted in dual capacities. The corporation's books noted a current liability due McGraw of $191,021.69 as of December 31, 1994.

ATM argues that it could not be bound to such an agreement because it was not a party to the shareholders' agreement.[2] The corporation had four shareholders, and all four shareholders signed the agreement.

The agreement contained an acknowledgement that the shareholders were to be reimbursed for their advances to the company. It was not necessary for ATM to be a party to the shareholders' agreement in order for McGraw to make a submissible claim on this issue. The shareholders' agreement is evidence that such an agreement existed, although it does not, in and of itself, comprise the agreement. ATM accepted McGraw's money, used McGraw's money and acknowledged its debt to McGraw in its corporate books. Accordingly, we hold that the trial court did not manifestly abuse its discretion in granting McGraw a new trial on his claim against ATM for breach of the oral loan agreement. McGraw made a submissible case on this claim and substantial evidence exists on each element of the claim. Point III is denied.

## Breach of Fiduciary Duties

■ In Point IV, the appellants claim that the trial court erred in granting a new trial on ATM's counterclaim against McGraw for the breach of his fiduciary duties toward the corporation. They claim that ATM made a submissible case, and every element of the claim was supported by substantial evidence. They also contend that the verdict was not against the weight of the evidence. The appellants are, in effect, inviting this court to reweigh the evidence.

■ The standard of review on this issue differs somewhat from the standard used in examining Points II and III because of the different procedural posture of the parties. In this instance McGraw is the counterclaim defendant on ATM's counterclaim in which it is asserted that McGraw breached his fiduciary duties to the company. Where the defendant is granted a new trial on the ground that the verdict is against the weight of the evidence, the test is whether a verdict rendered in favor of the defendant would

---

2. An argument can also be made that ATM is estopped from questioning the existence and validity of the contract because it accepted the benefit of the money advanced by McGraw. *See* *Dubail v. Medical West Bldg. Corp.,* 372 S.W.2d 128, 132 (Mo.1963).

have been allowed to stand. *Simpkins,* 909 S.W.2d at 685.

ATM alleged that McGraw breached his fiduciary duty to the company because the purchase of Unit 101 and Unit 105 was not "fair, open and in the utmost good faith." There was evidence, however, to the contrary and that evidence would have upheld a jury verdict in favor of McGraw.

We hold that the trial court did not err in granting McGraw's request for a new trial. Point IV is denied.

### Breach of Warehouse Lease

In their final point, the appellants take issue with the trial court's denial of a new trial based upon McGraw's claim for breach of the warehouse lease. They contend that the verdict was not supported by substantial evidence and was against the weight of the evidence. The appellants' attack is three-pronged. They contend: (1) ATM was not bound by the shareholders' agreement; (2) the amount the jury awarded in damages was in error; and (3) the warehouse lease payments were actually compensation for McGraw's services. McGraw claims that ATM's arguments concerning the amount of damages and whether or not ATM was a party to the lease are not properly preserved for appellate review because they were not presented to the trial court in ATM's motion for new trial. *See* Rule 78.07.

In any event, ATM's arguments are an attempt to persuade this court to weigh the evidence presented and resolve conflicts in the evidence. Such is forbidden under the standard of review for the trial court's denial of the appellants' motion for new trial. Review is performed in the light most favorable to the verdict and this court does not consider matters such as the weight of the evidence, the credibility of the witnesses, or the resolution of conflicting testimony. *Id.* Weighing the evidence is a trial court function. *Warren v. Thompson,* 862 S.W.2d 513, 514 (Mo.App.1993). The trial

court's denial of a motion for new trial on the grounds that the verdict was against the weight of the evidence is conclusive on that issue, and will not be overturned on appeal. *Id.* (citing *Bakelite Co. v. Miller,* 372 S.W.2d 867, 872 (Mo.1963)).

We cannot say that the trial court erred in refusing to grant ATM a new trial on the ground that the verdict in favor of McGraw on his claim for breach of the warehouse lease was against the weight of the evidence. Point V is denied.

### Conclusion

The order of the trial court granting a new trial to McGraw based upon his claim against Thompson for breach of the oral loan agreement is reversed. The trial court was without jurisdiction to order a new trial because the order granting the new trial was issued more than thirty days after entry of judgment and McGraw did not request such relief in his post-trial motions. The original Verdict J remains in full force and effect. In all other respects, the order of the trial court is affirmed.

### APPENDIX A

### SHAREHOLDERS' AGREEMENT

THIS AGREEMENT is made this November 25, 1991 between A.L. THOMPSON, SR., ("Lawrence"), WILMER C. ANDES ("Wilmer"), ROBERT P. MCGRAW ("Bob") and MICHAEL L. ANDES ("Mike").

Lawrence, Wilmer and Mike are the shareholders of ATM Corporation ("ATM"), and Bob is to become a shareholder. They have agreed to proceed with the construction of a 240–unit condominium project to be known as Apple Tree Manor on 18 acres of land on Bolger Road, Independence, Missouri (the "Project"). Thirty units will be constructed in the first phase, and 30 units at a time will follow in successive phases until completion of the Project. They wish to define their responsibilities and business relationships to one another with regard to the Project.

NOW, THEREFORE, in consideration of the mutual promises made and for other good and valuable considerations, it is agreed:

1. DEFINITIONS. As used in this Agreement:

a. "Proceeds" shall mean the net proceeds realized from the sales of condominium units after payment of expenses of sale.

b. "Project Costs" shall mean all costs and expenses connected with the Project, including, without limitation, land costs, architectural and engineering services, contractor's and subcontractor's costs, financing costs, principal and interest on any indebtedness of the Project, and all other expenses related to the Project.

c. "Net Cash Flow" shall mean, the amount, if any, by which the Proceeds exceed the Project Costs.

2. CONSTRUCTION CONTRACT. ATM will enter into a construction contract with Speed Oil Co., a Missouri corporation ("Speed") for the construction of the first 30 units ("Phase I") of the Project. The form of the construction contract is attached to this agreement as Attachment A.

3. CONSTRUCTION FINANCING. ATM will borrow $2,300,000 from First City Bank, Independence, Missouri (the "Bank") for one year, according to the terms of the Bank's commitment attached as Attachment B.

4. LETTER OF CREDIT. In order to induce the Bank to make the construction loan, Lawrence will provide the Bank a $500,-000 irrevocable letter of credit issued by Cayman National Bank and endorsed by a major New York Bank. The Bank will be entitled to draw on the letter of credit to cure any default which may occur in the loan from the Bank. Lawrence shall be reimbursed for any expenses incurred by him in obtaining the Letter of Credit. Such expenses shall be treated as Project Costs.

5. LOAN GUARANTORS. Lawrence and Bob (together with Cecily McGraw) will personally and individually guarantee the Bank's loan.

6. DISTRIBUTION OF NET CASH FLOW. Except as otherwise specifically provided in this Agreement, no distribution of Net Cash Flow shall be made until and unless all indebtedness of the Project is satisfied in full. The Net Cash Flow shall be divided and distributed as follows:

| | |
|---|---|
| Lawrence | 30% |
| Wilmer | 30% |
| Bob | 30% |
| Mike | 10% |

7. LAWRENCE'S LOAN. Lawrence will lend ATM a further sum of $100,000.00 to cover loan closing costs and other operating needs, which, with $200,000 already advanced by him, will make a total loan amount of $300,000.00. Such amount will be treated as indebtedness of the Project and repaid to Lawrence, with interest at the rate of 10% per annum from this date, as follows: $100,-000 from Phase II; $100,000 from Phases III; $100,000 from Phase IV. Amounts due for each phase will be paid from unit sales as and when such sales are closed. ATM will execute its promissory note as evidence of its debt to Lawrence in form attached as Attachment C.

8. LAND ACQUISITION COSTS. ATM has purchased from Speed 9 acres of land for the Project and will acquire another 9 acres upon the closing of the Bank's loan. The purchase price for the entire 18 acres is $500,000. $100,000 was paid to Speed when the first 9 acres was acquired and $100,000 will be paid from the Bank's loan, leaving a balance due of $300,000. From the closing of each unit sale, Speed will receive $2,500 toward the balance due for land acquisition costs until a total amount of $300,000 shall have been paid. The unpaid balance shall not bear interest and will be treated as indebtedness of the Project.

9. BUILDING LEASE. ATM will lease Bob's building at 315 N. Main, Independence, for storage and warehousing purposes for which ATM will pay Bob $3,000 per month rent, commencing November 1, 1991, and continuing until the first four phases of construction are completed. Such payments will be treated as Project Costs.

10. OUT–OF–POCKET EXPENSES. The parties hereto shall be reimbursed for

actual out-of-pocket expenses necessarily incurred by them in connection with the Project. All such amounts will be treated as Project Costs.

11. DISTRIBUTION PRIORITY. Wilmer hereby assigns to Bob, $18,000 (plus accrued interest) of the first Net Cash Flow distributions to which Wilmer shall be entitled, which amount shall be in payment of Wilmer's existing indebtedness to Bob.

12. CAPITAL STOCK. The common capital stock of ATM will be issued only to Lawrence (45 shares) and Bob (105 shares). No other shares will be issued without the written approval of all the parties hereto. As to the 105 shares of stock held by Bob, 60 shares will be held by him as title-holding trustee for Wilmer and Mike, so that, as between the parties to this Agreement, Bob will be the owner and holder of 45 shares (30% of ATM) in his own right and will be the owner and holder as trustee of 45 shares (30%) for Wilmer and 15 shares (10%) for Mike. Nevertheless, Wilmer and Mike shall at all times be the equitable owners of their respective shares. Whenever the Bank loan is fully satisfied or whenever the Bank shall not object to ownership of ATM stock by Wilmer and Mike, Bob shall, upon request by Wilmer and/or Mike, transfer and assign their respective shares to them. Irrespective of the stock issuance, Wilmer and Mike, as between the parties to this Agreement, shall at all times have the rights and privileges of full ownership of their respective shares, including the right to vote their shares in any meeting of the ATM shareholders.

13. DIRECTORS AND OFFICERS. Lawrence, Bob and Byron Constance shall serve as directors of ATM. Lawrence shall continue to serve as chairman of the board of directors, Bob shall serve as president, and Byron shall continue to serve as secretary.

14. COMPLETION OF PROJECT. It is the intention of the parties that upon the successful completion of Phase I, ATM will proceed with successive phases of 30 units each until the entire Project is completed. If, however, the shareholders shall elect at any time to terminate the Project, the assets of ATM, after full satisfaction of non-shareholder debts, will applied first in payment of any balance remaining for land acquisition costs, and to the payment of Lawrence's note and Lawrence's letter of credit (if drawn against), and finally in distribution to the shareholders in the proportions set forth in paragraph 6 above. If the remaining assets shall be insufficient to cover, (i) the land acquisition costs, (ii) Lawrence's note and (iii) all amounts, if any, which shall have been drawn by the Bank against Lawrence's letter of credit, then the assets shall be applied in satisfaction of such amounts in the proportion that the balance due on each such item shall bear to the total of all such items. For example, if unpaid balances of the above items are as follows:

| | | |
|---|---|---|
| Land costs | $200,000 | 32% |
| Lawrence's note | 325,000 | 52% |
| Letter of Credit draws | 100,000 | 16% |
| | $625,000 | 100% |

assuming only $400,000 of assets available for distribution, Wilmer would receive $128,000 (32% of $400,000) and Lawrence would receive $272,000 (68% of $400,000).

15. CONSTRUCTION, ETC. This Agreement is to be construed, enforced, and governed in accordance with the laws of the State of Missouri.

16. BINDING EFFECT. The terms and provisions of this Agreement shall be binding upon, be enforceable by, and inure to the benefit of, the parties hereto and their respective heirs, personal representatives and assigns.

17. INTERPRETATION. The description headings contained herein are for convenience only and are not intended to define the subject matter of the provisions of this Agreement and shall not be resorted to for interpretation thereof. If any part of this Agreement shall be held to be void or unenforceable, the balance thereof shall nevertheless be carried into effect.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement on the date first above written.

/s/ A.L. Thompson
A.L. Thompson
/s/ Wilmer C. Andes
Wilmer C. Andes

/s/ Robert P. McGraw
Robert P. McGraw
/s/ Michael C. Andes
Michael C. Andes