Thomas **GARRISON**, Plaintiff-Appellee,
Orangeville Manufacturing Company, Inc., Defendant, Cross-Plaintiff-Appellee,

v.

**ROHM AND HAAS COMPANY,**
Defendant-Appellant.

Thomas **GARRISON**, Plaintiff-Appellee,

v.

**ORANGEVILLE MANUFACTURING COMPANY, INC.,** Defendant-Appellant.

Nos. 73–1490, 73–1491.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 28, 1973.

Decided Feb. 26, 1974.

John P. Sandidge, Louisville, Ky., for defendants-appellants; Robert C. Hobson, Woodward, Hobson & Fulton, Louisville, Ky., on brief, for Rohm & Haas Co.; Victor W. Ewen, John G. Crutchield, Ewen, MacKenzie & Peden, Louisville, Ky., on brief, for Orangeville Manufacturing Co.

John E. Wise, Louisville, Ky., for plaintiff-appellee; Franklin S. Yudkin, Louisville, Ky., on brief, for Thomas Garrison.

Before WEICK and LIVELY, Circuit Judges, and JOINER,* District Judge.

WEICK, Circuit Judge.

This is a products liability case in which jurisdiction was based on diversity of citizenship. The issues admittedly are governed by Kentucky law. The plaintiff, Garrison, was injured when a large carton containing sheets of Plexiglas fell off a dolly and struck him, at the plant of Rohn and Haas, in Louisville, Kentucky, where he was employed. The dolly had been manufactured by Orangeville Manufacturing Company, according to designs, plans and specifications prepared and furnished by Rohm and Haas.

Garrison sued Orangeville and Rohm and Haas in the District Court to recover damages for the personal injuries which he sustained. In his complaint he alleged that Orangeville negligently designed, manufactured, assembled and tested the dolly; and asserted breach of express and implied warranty and "strict liability" under Section 402A of Restatement of the Law of Torts. He also alleged that Rohm and Haas was negligent in failing to furnish safe equipment for use of its employees, and that it should have discovered the defective design of the dolly and warned its employees of the danger.

---

* The Honorable Charles W. Joiner, Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

The District Court dismissed Rohm and Haas on its motion on the ground that Garrison was its employee and that he had accepted benefits under the Kentucky Workmen's Compensation Act (K. R.S. § 342.015(1)), which provides the exclusive remedy against employers. No appeal was taken from that order.

Orangeville filed a cross-claim against Rohm and Haas seeking indemnification in the event it was held liable to Garrison. By agreement between Orangeville and Rohm and Haas the issues involved in the cross-claim were deferred to await determination by the District Court in the event that liability of Orangeville would be imposed.

The case was tried before a jury which returned a verdict against Orangeville in favor of plaintiff, in the amount of $37,500, on which verdict judgment was entered. The District Court then entered judgment against Rohm and Haas in favor of Orangeville on its cross-claim for indemnification, in the sum of $37,500. Both Orangeville and Rohm and Haas have appealed. We reverse both judgments.

Orangeville contends that the District Court erred in denying its motions for a directed verdict and for judgment notwithstanding the verdict. The grounds of these motions were (1) that the dolly was not being used for its intended purpose at the time of Garrison's injury; (2) that the dolly was designed by Garrison's employer, Rohm and Haas, rather than by Orangeville, and all that Orangeville did was to manufacture the dolly strictly in accord with the design and specifications furnished by Rohm and Haas; (3) that because the specifications were met there was no implied warranty; (4) that Orangeville owed no duty to warn as to the intended use by Rohm and Haas and such use was not inherently dangerous; and (5) that there was an intervening cause.

In its appeal Rohm and Haas contends that the Court should have directed a verdict and that it was error to render judgment against it.

Garrison was an employee of Rohm and Haas which manufactures acrylic sheet known as Plexiglas. In 1951 a company official saw a dolly-device at a convention, which device he thought might be useful for the handling of certain of his company's products. He described the device in general terms to Roger Anderson, one of the company's mechanical engineers. From this general description Anderson designed a model specifically suited for company use. It is a simple device, a four-wheel vehicle with a frame and a lip on the bottom of the frame, which allows Plexiglas to be transported thereon. This dolly was specifically designed to transport objects less than seventy-two inches in height.

Rohm and Haas ordered several of these dollies from the Fred Hill Company of Philadelphia, Pennsylvania. The Hill Company is a sales and service organization dealing in items for use in warehousing operations. The Hill Company in turn gave the orders to Orangeville. Orangeville is a small manufacturing company located in Pennsylvania, employing approximately forty persons. Orangeville produced the dollies in accordance with the exact specifications submitted by Rohm and Haas. Neither the Fred Hill Company nor Orangeville had any part in the design of the dolly. Originally these dollies were used in the Knoxville plant of Rohm and Haas.

Rohm and Haas later designed a second dolly to carry boxes of Plexiglas taller than seventy-two inches in height, this larger dolly having a wheel base larger than that of the dolly originally designed for use of boxes under seventy-two inches in height. Orangeville also made these larger dollies for Rohm and Haas, and these dollies have been used in the Knoxville plant of Rohm and Haas since the mid-1950's.

Several years ago Rohm and Haas decided to begin Plexiglas production at its plant in Louisville, Kentucky. Rohm and Haas sent Don Simon, assistant supervisor of its Louisville warehouse, to its Knoxville plant for training

in the handling of various sizes of boxes of Plexiglas. Bob McDearman, the Louisville warehouse supervisor and Simon's superior, had worked at the Knoxville plant for several years and was already familiar with the dolly-capacity and uses. Simon spent several days in the Knoxville plant learning how to handle the various sheets. Simon knew of the two different dollies and of the capabilities of each.

Both large and small dollies were ordered for the Louisville plant from the Fred Hill Company, which in turn placed the orders with Orangeville.

The accident in question occurred on August 12, 1970. At that time only the regular-sized dollies had arrived at the Louisville plant. On the day of the accident neither McDearman nor Simon was expecting a shipment of Plexiglas at the Louisville plant. One of Simon's workmen told him that a truck containing Plexiglas sheets had just arrived. Simon went to inspect the truck. He found that the truck was loaded with twelve boxes containing seventy-two-inch-size Plexiglas and two large boxes containing one hundred and four-inch Plexiglas.

Simon testified that he explained the problem to be faced in unloading the large boxes, to Garrison, Silas Toby (another employee of Rohm and Haas who was assisting with the unloading), and Winert, the truck driver for the carrier. Garrison testified that no specific explanation was made of the hazard involved in handling the larger boxes.

There is evidence that Toby and Garrison unloaded some of the seventy-two inch sheets on the dolly designed for that purpose while Simon supervised. Garrison testified that he did not assist in placing any of the smaller boxes on the dolly but he admitted that he did help wheel the dolly loaded with the smaller cartons into the warehouse. Toby and Garrison took four or five of these boxes from the truck into the warehouse where the sheets were placed upon A-frames.

At this point the men came to a large box on the truck. Simon decided that they would have to use the dollies intended for seventy-two inch boxes, to carry the one hundred and four-inch boxes. This decision was based on the fact that he had to get the truck belonging to the carrier unloaded, and he had no available means of doing so other than to use the dolly intended for the seventy-two inch boxes. Simon even testified that he would have ignored any warning that might have been placed on the dolly concerning height limitations. He knew of the hazard but felt he had no choice.

The four men (Garrison, Toby, the truck driver and Simon) succeeded in placing the one hundred and four-inch box containing the Plexiglas onto the dolly, but they did not try to move it into the warehouse. At this point Simon testified that he felt it was too dangerous to attempt to transport the overloaded dolly to the warehouse area with the limited personnel he had on hand. Simon told the other men that he was going to get additional help and that they should not try to move the dolly into the warehouse while he was gone. Simon returned shortly with three additional men. He testified that he explained once again the problem, for the benefit of the new workers. Garrison denied hearing such instructions. Simon claimed that he told all of the men there assembled not to stand behind the box or the dolly, but to support it from the sides. He claimed that all seven men were involved in moving the dolly from the truck into the warehouse. Garrison testified that only four men were involved physically in the moving of the heavily loaded dolly into the warehouse. However, there is no dispute that Garrison knew that Simon thought additional men (beyond those already on hand) were needed to transport safely the large package on the dolly.

The first large box was moved successfully and safely from the truck to the warehouse. Immediately thereafter Simon received a telephone call and had

to leave the scene of the unloading. Simon issued no prohibition against unloading the large box, but he had granted authorization to unload the smaller boxes only. ·

After Simon left the scene for his telephone call the truck driver wanted to search the truck for a box which was designated to be delivered elsewhere, but which had been misplaced. The truck driver, Bob Bottomly (a Rohm and Haas employee) and Garrison lifted the remaining large box onto the dolly and moved it three or four feet away from the other boxes stacked in the truck. Garrison held onto the dolly, standing behind it, while the truck driver and Bottomly went behind the large box of Plexiglas to look for the missing box. Shortly thereafter Garrison heard someone yell to him to run. He tried to move quickly away from the dolly, but was struck by the large box and the dolly.

Apparently when the truck driver and Bottomly were looking for the missing box, they stacked some of the smaller boxes on end; these boxes tipped and fell toward the large box and the dolly. It is not clear whether the toppling boxes actually fell against the large Plexiglas box, causing the accident, or whether Garrison applied too much backward force to the handle of the dolly when he heard the warning to run.

At trial and here appellee relied heavily on the testimony of Dr. Donald Cole, a mechanical engineer, who was an Associate Professor of Mechanical Engineering at the Speed Scientific School of the University of Louisville. Dr. Cole had examined the standard dolly and evaluated its safety in relation to moving a large one hundred and four-inch box. His opinion was that the dolly in question was defectively designed to carry such a load. Dr. Cole stated that, given the center of gravity of the dolly and of the one hundred and four-inch box, it would take only four or five pounds of backward force on the handle bar to topple the load backward. Dr. Cole made tests of the regular-size dolly

only, with a large package. He made no tests regarding design safety for packages seventy-two inches in height or under. Accordingly, he expressed no opinion as to design safety of the dolly for its intended use. Prior to the time of his testimony, Dr. Cole did not know the intended use of the regular-size dolly which he had inspected.

In other portions of his testimony Dr. Cole stated that he found no defect in materials or workmanship in the dolly which he had inspected.

Dr. Cole suggested several features that might have prevented this accident. Among these possible safety features were a warning on the dolly itself about load limits and a bar jutting out from the dolly that would have prevented the loading of packages of over seventy-two inches in height. There was no evidence that a dolly had ever been so designed with such a bar, nor that there was one in actual use anywhere.

Evidence was also introduced at trial that Rohm and Haas had redesigned its regular dolly after the accident in order to broaden its base, to change its wheel position, and to place a warning on the dolly about the size of the cartons that could be transported safely thereon. No issue was raised on appeal about the competency of this evidence.

■ What Rohm and Haas did after the accident in changing its design could not impose any liability on Orangeville. Basically Garrison's entire case was made up of charges which he could properly level against his own employer, Rohm and Haas, but he is precluded from doing so because of the Workmen's Compensation Act of Kentucky.

■ The jury verdict would have to be based on unreasonable conduct by Orangeville; it was the only defendant. Dr. Cole, appellee's expert, admitted that there was no defect in workmanship or materials in the dolly. Garrison's grounds of recovery against Orangeville are based on defective design, failure to warn, and failure adequately to test for safety of the product. The first asser-

tion is defective design; even if there was a defective design so far as wheel placement and center of gravity were concerned, the party responsible was not Orangeville. Rohm and Haas was the designer, not Orangeville. To hold Orangeville liable for defective design would amount to holding a non-designer liable for design defect. Logic forbids any such result.

The only party even theoretically liable for design defect in this case in Rohm and Haas. There is a serious question whether even it could be held for design defect under applicable case law. Kentucky law on design liability was pronounced in the recent case of Jones v. Hutchinson Mfg., Inc., 502 S. W.2d 66 (Ky., decided June 15, 1973). In this case plaintiff asserted defective design of a grain auger in which plaintiff's foot had become entangled and eventually cut off. A safety engineer testified that there were designs available which would have prevented the injury. Defendant manufacturer presented expert testimony to the effect that the auger was designed the same as those throughout the industry and that the guard design suggested by plaintiff's expert had been found to impair the efficiency of the auger.

■ The Court of Appeals of Kentucky held that when design defect is asserted—

. . . [T]he distinction between the so-called strict liability principle and negligence is of no practical significance so far as the standard of conduct required of the defendant is concerned. In either event the standard required is reasonable care.

Besides this reasonableness standard, the Court stated that a manufacturer was not an insurer that its product was incapable of producing injury. The Court relied on an annotation, Products Liability—Duty as to Design, 76 A.L.R. 2d 93, 94, to support these two basic principles of design liability.

This is significant because this Court has embraced the same principle pre-

viously and cited the same annotation in Gossett v. Chrysler Corp., 359 F.2d 84 (6th Cir. 1966). The issue in Gossett was asserted negligence on the part of Chrysler in the design of a hood latch on a truck. The latch would close securely unless a safety device were manually held out of place. This apparently happened and a hood flew open, obstructing the driver's view and causing an accident and injuries. An expert testified that proper design would require manufacture of a hood latch that could not be distorted manually. However, the expert did not testify how such a design could be achieved. Judge Cecil wrote for the Court:

It [the latch] functioned perfectly for the purpose for which it was intended. It was only when it was misused that it did not function properly. (359 F. 2d at 88)

Gossett cited with approval Marker v. Universal Oil Prods. Co., 250 F.2d 603 (10th Cir. 1957), where the Tenth Circuit held:

[T]he rule is well settled that neither designer nor manufacturer has a legal duty to adopt or produce a process or product incorporating only features representing the ultimate in safety. (250 F.2d at 605)

■ The relevance of these cases is clear. The dolly in the case at bar, like the hood latch in Gossett, functioned perfectly for its intended purpose, namely for moving seventy-two-inch boxes. Indeed, the regular-sized dollies had been used by Rohm and Haas for more than twenty years without incident. Moreover, Marker leaves no doubt that Rohm and Haas was not required to meet the highest possible safety standards.

The second theory asserted by plaintiff was that Orangeville failed to warn Garrison about placing large loads on the regular-size dolly. This warning presumably could have been made in the form of a sign prominently displayed on the dolly.

**352**

Under Kentucky law there is a general duty on the part of a manufacturer to warn of a danger known to the manufacturer (or supplier) but unknown to someone who the manufacturer could reasonably anticipate would use the product. Post v. American Cleaning Equip. Corp., 437 S.W.2d 516 (Ky.1968).

In the case at bar there was no knowledge on the part of Orangeville of any hidden danger. Indeed, Orangeville did not even know of the intended use of the product other than that it was to move products.

In addition, the case of Hercules Powder Co. v. Hicks, 453 S.W.2d 583 (Ky.1970), is controlling on the warning issue. Here, Hercules manufactured dynamite which it marketed through various distributors. One such distributor was Herbert. Herbert entered into a contract to supply dynamite to the Wabassco Construction Company and also render advice to the company concerning the handling and use of the product. Early in 1966 Wabassco was engaged in dynamiting operations. After an explosion had been detonated the foremen and employees noted a "high spot." The foreman, Staples, directed Hicks, a Wabassco employee, to "knock off" the high spot. Cox, another employee, came to help with a shovel. Hicks used a jack hammer to level the spot and an explosion occurred. Both Cox and Hicks were badly injured. The evidence presented at trial showed that Hicks and the foreman knew that such a high spot might contain unexploded dynamite. It was not clear whether Cox had such personal knowledge. The Court of Appeals cited Post, supra, as holding that there is a duty to warn of a danger of which the supplier knows but which is unknown to a likely user. The Court then stated:

The danger was personally known to Hicks. Cox's foreman also knew the danger, and the defendants [Hercules and Herbert] had no reason to know that he would not warn Cox. Hicks and Cox needed no additional warning of it. Hence, the rationale of Eck [Eck v. E. I. DuPont DeNemours & Co., 393 F.2d 197 (7th Cir. 1968)] and Post [Post v. American Cleaning Equip. Corp., 437 S.W.2d 516 (Ky. 1968)] affords no basis for imposing upon Hercules a duty to warn in the present case. We conclude that the trial court erred in failing to direct a verdict in behalf of Hercules and again in denying Hercules' motion for judgment n. o. v. (453 S.W.2d at 590)

In the present case there is a factual controversy over whether Garrison had actual knowledge of the danger involved, but there is absolutely no controversy over whether foreman Simon knew of the danger, as foreman Staples knew of the danger in Hercules. In Hercules, Cox was prevented from recovery against the Powder Company by reason of the foreman's knowledge. Similarly, Garrison cannot recover against Orangeville.

Any failure to warn must rest on Simon and Rohm and Haas. In addition, Orangeville did not even have knowledge of the intended purpose, let alone knowledge of any danger that might have been involved in the product that it made. Such knowledge of danger is the first prerequisite of a duty to warn under Post, supra.

The final theory of liability is that Orangeville failed to test the dolly to determine whether it was safe. The testing issue was raised in the initial pleading but was largely ignored in the briefs submitted to this Court.

At the conclusion of the evidence the District Judge gave the following instruction:

Now it was the duty of—it was the duty of Orangeville, when manufacturing the machine, to incorporate into the machine safety features which they knew about or in the exercise of ordinary care and reasonable judgment should have known about before distributing it for use for the purpose intended or for which it was reasonably anticipated. (App. at 593)

This instruction raises both the testing issue and the design-defect issue. To a large extent the two issues are interrelated, for the failure to test properly could result in a design-defect going undetected.

 While it may be proper to impose upon a manufacturer making goods for the general public a duty to test for safety in reasonable end-uses, we find it unreasonable to impose upon a manufacturer such a duty to test for design safety where the manufacturer is making something to particular specifications supplied by the customer. In such a situation the only thing that such a manufacturer should reasonably be expected to test for is whether the specifications have been complied with. In situations like this the customer who submits the specifications should have the basic responsibility for testing. The customer who submits the specifications knows the intended use and the specific manner in which that use is to be carried out. In this case Orangeville did not even know the specific intended use so far as weight-loads and heights were concerned.

Dr. Cole, the mechanical engineer, testified that testing would be carried out best in the working conditions, which in this case would be in Rohm and Haas' plants. This makes practical sense and serves as yet another reason why Orangeville should not have a duty to test in this unique factual situation.

Moreover, there is absolutely nothing to indicate that testing by Orangeville would have indicated any defect in design for the intended use. Packages of seventy-two inches or less had been transported by Rohm and Haas on this type of dolly for more than twenty years without incident. That certainly seems to be adequate testing. The later changes that were made may have improved and increased safety features, but there is no showing in this record that the regular dolly was in any way unsafe for its intended use.

We hold that the District Court erred in not granting appellants' motions for a directed verdict and for judgment notwithstanding the verdict. This holding requires also a reversal in the appeal of Rohm and Haas.

Appellants' second assignment of error was the District Court's refusal to give an instruction on contributory negligence, and that intervening cause was adequate ground to entitle appellants to a new trial. In view of our holding that a verdict should have been directed, it is not necessary for us to pass upon these issues. In both appeals the judgments of the District Court are reversed.