

# In the Missouri Court of Appeals Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| NORMAN HOPFER AND TERRI HOPFER, | ) ) ) | No. ED101754 |
| Appellants, | ) ) ) | Appeal from the Circuit Court of the City of St. Louis |
| vs. | ) ) | |
| NEENAH FOUNDRY COMPANY, | ) ) | Hon. Joan L. Moriarty |
| Respondent. | ) ) | FILED: September 22, 2015 |

## Introduction

Appellants Norman and Terri Hopfer (collectively referred to as "Hopfer") appeal from the judgment of the trial court denying Hopfer's motion for new trial, following a jury verdict in favor of Respondent Neenah Foundry Company ("Neenah"). Norman Hopfer suffered injuries when he lost control of his pickup truck after driving over an open drainage inlet. At least one of the grates covering the inlet had become dislodged. Hopfer filed suit against Neenah, the grate manufacturer, under a strict products liability theory. Hopfer alleged that the drainage grates used to cover the inlet were defective. On appeal, Hopfer contends that (1) the trial court erred in allowing Neenah to present the affirmative defense of compliance with contract specifications to the jury in Jury Instruction No. 8, and (2) the trial court erred in excluding evidence of

Neenah's failure to conduct Failure Mode and Effects Analysis ("FMEA") testing when designing the grate system.

Because the affirmative defense of compliance with contract specifications is available to defendants in strict products liability claims in Missouri, and because sufficient evidence was presented at trial from which a jury reasonably could find Neenah was entitled to this defense, the trial court did not err in submitting Jury Instruction No. 8 to the jury. Missouri jurisprudence embraces a clear demarcation between claims of negligence and strict product liability that differentiates the evidence required to prove such claims. Because the proposed FMEA evidence raised matters related to Neenah's conduct, a consideration not at issue under Hopfer's claim for damages under a theory of strict products liability, the trial court did not abuse its discretion in excluding the FMEA evidence at trial. Accordingly, the trial court did not abuse its discretion in denying Hopfer's motion for new trial. We affirm the judgment of the trial court.

Factual and Procedural History

Norman Hopfer was severely injured following a June 2009 car accident. Hopfer lost control of his pickup truck after driving over an open drainage inlet on Hall Street in the City of St. Louis. At least one of the grates covering the inlet was dislodged at the time Hopfer drove over the inlet. In his lawsuit, Hopfer alleged that Neenah was liable for his injuries under a strict products liability theory. Specifically, Hopfer alleged that the grates over which he drove became dislodged due to defects in the design which provided only two open-slot bolts to secure the grates. Neenah, a manufacturer of cast-iron products, produces cast-iron drainage grates used to cover drainage inlets. Neenah's normal grates have four bolts fastening each grate to a frame. The grates in question on Hall Street were modified to use only two bolt holes. Neenah manufactured the grate used to cover the inlet on Hall Street involved in Hopfer's accident under

2

a contract with the Missouri Department of Transportation ("MoDOT"), which installed the grates as part of its road improvement program.

## I.    Pretrial Motions

Hopfer sought to introduce evidence at trial that Neenah failed to conduct FMEA testing on the two-hole grates in question. The trial court granted a pretrial motion-in-limine filed by Neenah excluding any discussion of Neenah's conduct in designing the grate system, including FMEA testing. Hopfer made an offer of proof consisting of testimony from his designated expert witness, Dr. van Schoor, who described FMEA testing as an analytical process used by manufacturers to detect potential failures in a product. FMEA testing is utilized during the design process to identify and correct potential problems. The trial court ruled that Hopfer's proffered FMEA evidence was inadmissible because it was not relevant to the jury's inquiry as to whether the grates were defective, but instead related to Neenah's conduct in designing the grates, a consideration that is "wholly irrelevant to a strict product liability claim." The trial court was not persuaded by Hopfer's attempts to classify FMEA testing as an "analytical tool" or an "engineering practice." The trial court concluded that "no amount of semantic legerdemain can change the obvious fact that it amounts in substance to safety-related _conduct_ relative to the design-manufacturing process."

Neenah filed a pretrial motion for summary judgment arguing, _inter alia_, that it was not liable for Hopfer's injuries under a theory of strict liability due to the compliance with contract specifications affirmative defense. Neenah maintained that it made the grates at issue pursuant to specifications provided by MoDOT. The trial court denied Neenah's motion, concluding that summary judgment could not be granted based on the factual record then before it. In its order, the trial court concluded that there was "evidence of [Neenah's] expertise and participation in the

3

design of the grates which would preclude the application of the compliance with contract specifications doctrine."

Hopfer also filed a pretrial motion for partial summary judgment seeking to strike Neenah's affirmative defenses, including the compliance with contract specifications defense. The trial court denied Hopfer's motion. In its order, the trial court clarified and contextualized the language used in the prior order denying Neenah's motion for summary judgment. The trial court explained that its previous order, as a ruling on a motion for summary judgment only, did not contain "Findings of Fact." The trial court clarified that the language in its previous order stating that certain evidence "would preclude" the application of the compliance with contract specifications defense indicated only that "there is a question of fact on the issue."[1]

## II.    Evidence at Trial

At trial, Neenah offered evidence that the grates were not defective. Neenah also asserted the affirmative defense of compliance with contract specifications. Neenah presented evidence that it merely manufactured the grates in compliance with MoDOT's design specifications, and therefore could not be held liable under a cause of action asserting strict products liability. At trial, Neenah presented evidence that it had originally manufactured the grates in compliance with MoDOT's specifications from a 1999 retrofitting project in the St. Louis area ("the 1999 retrofitting project"). Neenah presented evidence that it had no input on the design of the grates.

---

[1] Hopfer argued both in his brief and at oral argument that the trial court's pretrial order denying Neenah's motion for summary judgment removed the compliance with contract specifications defense from the case, thereby precluding Neenah from asserting the defense at the subsequent trial. While the trial court concluded that there existed evidence that Neenah participated in the design of the grates which "would preclude" the application of the compliance with contract specifications defense, that conclusion was reached within the context of Neenah's pretrial motion for summary judgment. The only effect of the trial court's order was to deny Neenah's request for summary judgment on the ground that disputed facts existed regarding the applicability of the affirmative defense. Our reading of the original order is confirmed by the trial court's subsequent ruling denying Hopfer's motion for summary judgment which sought to exclude Neenah from asserting the compliance with contract specifications defense at trial. In its subsequent order, the trial court clearly explained that the "would preclude" language of its prior order indicated only that there was a question of fact on the issue. As such, the trial court's order did not preclude Neenah from presenting evidence regarding the compliance with contract specifications defense at trial.

4

Neenah's evidence showed that it simply relied on the specifications requested and approved by MoDOT, and manufactured the grates in compliance with MoDOT's specifications. Neenah maintained that MoDOT specified the same grates which were manufactured for use in the 1999 retrofitting project were to be used in the 2005 Hall Street project.

At trial, the parties presented conflicting evidence regarding Neenah's reliance on MoDOT's specifications in manufacturing the grates and Neenah's participation in the design process. Hopfer conceded that the grates used in the Hall Street project were the same as those used in the 1999 retrofitting project, but argued that the plans for the Hall Street project did not specify the type of grates to be used. Hopfer additionally presented testimony that MoDOT relied on Neenah to design and manufacture the two-bolt grate, and relied on Neenah to gauge the safety of a two-bolt grate, which was a departure from the four-bolt grate manufactured by Neenah. Specifically, Hopfer presented testimony that MoDOT does not design roadway grates, as well as testimony that the eventual grate design was simply a modified Neenah grate design.

Conversely, Neenah elicited testimony that MoDOT hired Neenah and Engineering Design Source, Inc. ("EDSI") to assist in the planning and engineering for the 1999 retrofitting project. Stephen Akkala ("Akkala"), a Neenah employee and engineer, testified that MoDOT and EDSI asked Neenah to change its standard four-hole grate to a two-hole design. Akkala further testified that MoDOT was "controlling the show" with respect to the design of the grates, and that Neenah "supplied what they asked for." Akkala stated that MoDOT or EDSI told Neenah on two separate occasions to change the dimensions of the grate and the number of bolt holes.

The jury was also shown a video deposition of Randall Glaser ("Glaser"), the MoDOT project manager in charge of the design and approval of the 1999 retrofitting project. In his

5

deposition, Glaser stated he was responsible for designing the grate system and he relied on Neenah only to cast a grate that would fit. Glaser stated that he signed off on the grates for use in the 1999 retrofitting project, and that he verbally approved drawings submitted by Neenah based on MoDOT's requested specifications for the grates. A representative from EDSI also approved the details and dimensions of the grates for the 1999 retrofitting project.

Neenah ultimately manufactured the grates in accordance with MoDOT's specifications calling for two bolt holes rather than four. Akkala testified that Neenah's only role in the process was to follow the instructions provided by the engineers to change the grates to contain two holes. Akkala stated that the grates Neenah supplied to MoDOT matched the MoDOT specifications. Glaser stated that after his final approval of the drawings, Neenah had no discretion to change the design of the grates. Glaser also testified that a MoDOT project engineer or resident engineer would be required to "specify" the use of the four-hole grates in order for those grates to actually be used in the 1999 retrofitting project. Further, Glaser stated that MoDOT was required to check the grates after completion of the project to ensure that the grates used were in compliance with MoDOT's specifications. Either Glaser or George John ("John") from EDSI sealed and approved all of the engineering drawings for the project; ultimately, the grates provided by Neenah complied with the specifications required by MoDOT.

The same grates that were developed for the 1999 retrofitting project were used in the Hall Street project, which began in 2005. The Hall Street project, like all MoDOT projects, had a project-specific project manual. The project manual called for the use of "modified Type A inlet covers [grates] as shown in the plans or as directed and approved by the engineer." The plans for the Hall Street project, however, did not specify the particular grates to be used. As a result, the MoDOT engineer for the project was required to choose an appropriate grate.

6

The deposition of John Brendel ("Brendel"), one of the MoDOT engineers in charge of the Hall Street project, was read into evidence at trial. Brendel stated that MoDOT provided all of the specifications, plans, and drawings for the Hall Street project, as well as directed what kind of grates would be used. Brendel consulted with the MoDOT project engineer, Larry Burke ("Burke"), to decide what type of grates to use. Neenah was not consulted. Consequently, Brendel and Burke decided that the Neenah two-hole grates originally created for the 1999 retrofitting project were to be used in the Hall Street project. The specification was relayed to the Hall Street project contractor, and the contractor ordered the grates. Another MoDOT engineer on the Hall Street project, Tom Evers ("Evers"), testified that he accepted the work completed at the conclusion of the project as complying with MoDOT specifications, including the two-hole grates.

III.    Jury Instruction No. 8 – Compliance with Contract Specifications Defense

At the close of evidence, Neenah offered Jury Instruction No. 8, which submitted the affirmative defense of compliance with contract specifications. Hopfer objected, arguing that the compliance with contract specifications defense was not available to Neenah because Hopfer presented evidence that MoDOT relied on Neenah's expertise in designing the grates. Neenah acknowledged that a question of fact existed with respect to the issue of reliance, but maintained that this factual issue was for the jury to decide. The trial court overruled Hopfer's objection and submitted Jury Instruction No. 8 to the jury, noting that Neenah was entitled to raise the compliance with contract specifications defense as authorized in Bloemer v. Art Welding Co., 884 S.W.2d 55 (Mo. App. E.D. 1994).

7

## IV.    Hopfer's Motion for New Trial

The jury returned a verdict in favor of Neenah on all counts. Hopfer subsequently filed a motion for new trial alleging, *inter alia*, that the trial court's submitting Jury Instruction No. 8 to the jury and excluding evidence of Neenah's failure to conduct FMEA testing when designing the grate system prejudiced Hopfer and denied Hopfer a fair trial. The trial court issued an order, memorandum, and judgment denying Hopfer's motion for new trial. The trial court's order and memorandum explained in detail its reasoning for denying Hopfer's motion for new trial.

As to Hopfer's first claim of instructional error, the trial court concluded that "there was substantial evidence adduced at trial that the grates here in question, made and supplied by Defendant Neenah, were subject to, and complied with, contract specifications by MoDOT requiring that they be a two-hole, open-slot type of grate." The trial court explained that Jury Instruction No. 8 was properly submitted to the jury despite conflicting factual evidence as to Neenah's reliance on MoDOT specifications because "[t]he trial court is the judge of law, not fact," and as such, "the factual element of reliance, when that fact issue is genuinely disputed, is properly one for the jury—not the trial court—to decide. " The trial court further explained that Hopfer's argument that the compliance with contract specifications defense was not available to Neenah "misreads the Bloemer case." The trial court clarified that "Bloemer plainly stands for the proposition that, under Missouri law, a manufacturer-designer's compliance with its customer's contractual plans/specifications can be a complete defense to a strict liability claim based on defective design." Finally, the trial court concluded that the availability of the compliance with contract specifications defense in strict liability cases is consistent with the

8

basic policies underlying modern strict liability statutes, pointing out that Hopfer's contention to the contrary "has been rejected by a majority of courts that have considered the issue."

The trial court also rejected Hopfer's argument that the 1987 enactment of Sections 537.760[2] (Missouri's basic products liability statute), 537.764 (codifying the "state of the art" affirmative defense), and 537.765 (codifying the comparative fault affirmative defense) precludes the availability of other affirmative defenses in strict liability claims, including the compliance with contract specifications defense. Hopfer reasoned that because Sections 537.764 and 537.765 are the only *statutorily*-created express affirmative defenses in strict products liability claims, Missouri law recognizes *only* those two affirmative defense and no others. The trial court concluded that Hopfer's statutory interpretation was "not tenable" and directly in conflict with post-1987 Missouri case law, including Bloemer.

As to Hopfer's claim that the trial court erred in excluding evidence of Neenah's failure to conduct FMEA testing when designing the grate system, the trial court stated that "FMEA evidence is not properly a part of this case." The trial court noted that Missouri "adheres to the view that negligence concepts generally are to be kept out of such [strict liability] cases." As a result, the trial court explained, Missouri courts have prevented attempts to introduce evidence that the design or process of designing a product comports with certain industry standards because such evidence "improperly focuses on the quality of the defendant's *conduct* in making its design choices rather than on the attributes of the product itself, and thereby tends to mislead the jury's attention from their proper inquiry." Applying this rule to Hopfer's claim, the trial court concluded that the choice of whether to perform FMEA testing was clearly "a form of conduct" by Neenah in the design and manufacturing process. As such, the FMEA evidence Hopfer sought to introduce at trial was "proof of allegedly negligent **conduct**—i.e., an alleged

[2] All statutory references are to RSMo. 2000.

9

lack of reasonable care—by [Neenah] in the design/manufacturing process." Because such evidence of conduct goes to Neenah's negligence, which is irrelevant in strict product liability claims, the trial court concluded that the FMEA evidence was properly excluded at trial. This appeal follows.

## Points on Appeal

Hopfer presents two points on appeal. First, Hopfer contends that the trial court erred in allowing Neenah to present the affirmative defense of compliance with contract specifications to the jury in Jury Instruction No. 8 because Sections 537.760 through 537.765 do not allow for such a defense in cases of strict products liability, and such a defense is inconsistent with the policies of strict product liability. Specifically, Hopfer argues that the compliance with contract specifications defense was not available to Neenah because Hopfer did not make a negligence claim, and because the grate system manufactured by Neenah was not specified in the MoDOT construction contract for the Hall Street project. Second, Hopfer avers that the trial court erred in excluding evidence of Neenah's failure to conduct FMEA testing when designing the grate system because evidence of product design is admissible to show product defect in a strict products liability case. More specifically, Hopfer claims that a prudent manufacturer would have conducted FMEA testing, and that the exclusion of that evidence prevented Hopfer from demonstrating how the grates were defectively designed for foreseeable uses of the product.

## Standard of Review

The trial court has broad discretion in deciding whether to grant a new trial. Woods v. Friendly Ford, Inc., 248 S.W.3d 699, 705 (Mo. App. S.D. 2008). We review the trial court's denial of a motion for new trial for abuse of discretion. Id. "An abuse of discretion occurs when the trial court's ruling is clearly against the logic of the circumstances and is so unreasonable and

10

arbitrary that it shocks the sense of justice and indicates a lack of careful deliberate consideration." State v. Stallings, 406 S.W.3d 499, 503 (Mo. App. W.D. 2013). Our review is performed in the light most favorable to the verdict. McGraw v. Andes, 978 S.W.2d 794, 805 (Mo. App. W.D. 1998). On appeal, this Court "does not consider matters such as the weight of the evidence, the credibility of the witnesses, or the resolution of conflicting testimony." Id.

## Discussion

### I. Point One – Instructional Error Claim

Hopfer raises a two-pronged challenge to the trial court's submission of Jury Instruction No. 8. Hopfer first posits that the affirmative defense of compliance with contract specifications is not available in strict product liability cases in Missouri. Hopfer next argues that even if the defense is generally available in strict product liability cases, the defense was not available to Neenah given the specific facts of this case that the design of the grates manufactured by Neenah was not specified in the MoDOT construction contract for the Hall Street project. We disagree.

#### A. Standard of Review

The propriety of the instructions submitted to the jury is a question of law that is reviewed *de novo*. Klotz v. St. Anthony's Medical Center, 311 S.W.3d 752, 766 (Mo. banc 2010). "Review is conducted in the light most favorable to the submission of the instruction, and if the instruction is supportable by any theory, then its submission is proper." Id. As such, a defendant is entitled to an instruction on any theory that the evidence and the reasonable inferences therefrom tend to establish. State v. Westfall, 75 S.W.3d 278, 280 (Mo. banc 2002). Further, instructional errors will be reversed only if the error resulted in prejudice that materially affected the merits of the action. Klotz, 311 S.W.3d at 766.

#### B. The compliance with contract specifications defense is available in strict products liability claims in Missouri.

11

As a threshold matter we consider Hopfer's contention that the affirmative defense of a product manufacturer's compliance with contract specifications is not available to defendants in strict product liability cases in Missouri. Hopfer bases his position on two arguments. First, Hopfer contends that the compliance with contract specifications defense is not available to Neenah because the defense is inapplicable in a products liability action premised solely on strict liability. Second, Hopfer claims that the compliance with contract specifications defense is not available to Neenah because the Missouri legislature has not recognized this defense for strict products liability claims. We will address each argument in turn.

The compliance with contract specifications defense "shields a manufacturer from liability for injuries caused by a design defect in products it manufactures pursuant to plans and specifications supplied by the purchaser." 2 Owen & Davis on Prod. Liab. Section 14:2 (4th ed.). Missouri's initial recognition of an affirmative defense asserting compliance with contract specifications came in Gast v. Shell Oil Co., 819 S.W.2d 367 (Mo. banc 1991), in which the parents of a gas station cashier filed a wrongful death suit against a contractor who had renovated the cashier's room in accordance with the owner's specifications. In Gast, the Court recognized that a contractor is not liable for a *structure* built in compliance with owner specifications and accepted by the owner. The Court reasoned that the contractor "owed no duty to the [owner's] employees with respect to the design of the modifications" made to the cashier's room. Id. at 371.

Shortly thereafter, this Court directly addressed the compliance with contracts specification defense in Bloemer v. Art Welding Co., 884 S.W.2d 55 (Mo. App. E.D. 1994). The plaintiff in Bloemer sought to hold the manufacturer of a large cylindrical tank liable for injuries suffered by the plaintiff while cleaning the tank. The defendant manufacturer asserted a defense

12

that it could not be held liable for plaintiff's injuries because it had merely manufactured the cylindrical tank pursuant to its customer's specifications. Citing Gast, the plaintiff sought to limit the application of the compliance with contract specifications defense to buildings and structures only. This Court rejected such a limitation and expressly expanded the application of the defense to products, holding that the compliance with contract specifications defense equally applies to products liability claims and therefore to "chattels custom manufactured and installed in accordance with the customer's plans and specifications." Id. at 59. We further expanded the defense beyond the scope of negligence claims by holding that "a contractor's compliance with its customer's plans and specifications is ... a complete defense to strict liability *and* negligence claims based on defective design." Id. at 56 (emphasis added).

The plaintiffs in Bloemer alleged products liability claims based on negligence *and* strict liability theories, whereas in the instant action Hopfer brought a claim based solely on strict liability. Hopfer suggests that this distinction gives cause for this Court to re-examine whether Bloemer is controlling precedent. We consider this factual distinction *de minimus*, and Hopfer's argument unavailing.

In Bloemer, we stated that the compliance with contract specifications defense, if applicable, acts as "a complete defense to strict liability and negligence claims based on defective design." Id. This holding is clear and unequivocal. Bloemer stands for the proposition that the compliance with contract specifications defense may be available to defendants (1) in products liability actions premised on both negligence and strict liability theories, as in Bloemer; (2) in products liability actions premised solely on strict liability, as is the case here; or (3) in products liability actions premised solely on negligence.[3]

---

[3]While Hopfer suggests this Court should reconsider Bloemer as it relates to strict products liability actions, we decline this invitation. We have found no contrasting authority from any court in Missouri questioning Bloemer's

13

Our holding in Bloemer recognized a broader applicability of the compliance with contract specifications defense consistent with the development of products liability law in Missouri. The Missouri Supreme Court, in an opinion predating Bloemer, explained a fundamental principle of strict liability under Missouri law: "strict tort liability is not, nor was it ever intended to be, an enveloping net of absolute liability." Nesselrode v. Executive Beechcraft, Inc., 707 S.W.2d 371, 375 (Mo. banc 1986). For this reason, the Court explained, "under strict liability a manufacturer is not intended to be an insurer for any and all injuries caused by its products." Id. Our holding in Bloemer consistently applied the principles addressed in Nesselrode—that a manufacturer should not be held absolutely and automatically liable in every instance in which its product causes an injury. In Bloemer, we reasoned that in order to avoid the 'enveloping net of absolute liability' portended in Nesselrode, strict liability must be limited in certain logical ways with respect to manufacturers and contractors: "to hold [a contractor] liable for defective design would amount to holding a non-designer liable for design defect. Logic forbids any such result." Bloemer, 884 at 59 (quoting Garrison v. Rohm & Haas Co., 492 F.2d 346, 351 (6th Cir. 1974). Allowing the affirmative defense of compliance with contract specifications by a manufacturer in a products liability action merely places a measured, logical limit on strict liability in order to ensure that strict products liability does not reach the untenable point of holding manufacturers absolutely liable for any and all injuries caused by their products.[4]

---

holding. In fact, the Missouri Supreme Court, while not directly addressing the applicability of the compliance with contract specifications defense, has cited Bloemer favorably. See Fisher v. State Highway Comm'n of Mo., 948 S.W.2d 607 (Mo. banc 1997).

[4] We note that expanding the compliance with contract specifications defense to strict products liability claims is in accord with the approach adopted by a growing majority of jurisdictions across the country. See, e.g., 2 Owen & Davis on Prod. Liab. Section 14:2 (4th ed.) (Stating that a "growing majority" of courts have held that "even in strict liability, a manufacturer who merely fabricates a product according to the purchaser's design is not responsible... if the design proves bad."); Herrod v. Metal Powder Products, 886 F. Supp. 2d 1271, 1275-1276 (D. Utah 2012)

14

Finally, we address Hopfer's contention that the 1987 enactment of Sections 537.760 (Missouri's basic products liability statute), 537.764 (codifying the "state of the art" affirmative defense), and 537.765 (codifying the comparative fault affirmative defense) precludes the availability of *any* other affirmative defenses in strict liability claims, including the compliance with contract specifications defense. Hopfer reasons that because Sections 537.764 and 537.765 are the only statutorily-created affirmative defenses in strict products liability claims, Missouri law recognizes only those two affirmative defenses and no others. This interpretation is untenable and completely without merit.

First, we note that the language set forth in Sections 537.764 and 537.765 does not expressly purport, in any way, to prevent or limit a defendant's ability to assert other affirmative defenses in a strict products liability action not set forth therein. Nor does either of these statutory previsions somehow implicitly preclude other affirmative defenses available by statute or common law, such as statutes of limitations or compliance with contract specifications. Rather, because "the legislature is presumed to be aware of the state of the law at the time it enacts a statute," a fundamental rule of construction is that statutes are to be construed "with reference to the principles of common law in force at the time of their passage, and statutes are not to be interpreted as effecting any change in the common law unless clearly so indicated in the statute." Martinez v. State, 24 S.W.3d 10, 17-18 (Mo. App. E.D. 2000). Here, nothing in the language of Sections 537.764 and 537.765 remotely suggests, much less clearly indicates, that these statutes were intended to abolish any and all other affirmative defenses which otherwise might be available to a defendant in a strict products liability claim. These statutes do not, for example, purport to create a comprehensive strict liability statutory scheme, nor do they include

(Stating that "with a few exceptions, most jurisdictions apply the contract specifications defense regardless of the theory of liability" and citing several cases in various jurisdictions so holding.).

15

any specific language precluding the future applicability of any other affirmative defenses in existence prior to their passage or which may develop in the law subsequent to their enactment. Instead, it is clear that the legislature enacted Sections 537.764 and 537.765 to codify *additional* affirmative defenses otherwise available in strict products liability claims. This interpretation is consistent with Missouri cases handed down subsequent to the 1987 enactment of Sections 537.764 and 537.765, including Bloemer, which plainly recognizes the existence of the compliance with contract specifications defense.

We decline to adopt a statutory interpretation grounded in mere speculation as to the legislature's intent, particularly when such an interpretation ignores the plain text of the statutes in question as well as fundamental rules of statutory construction. Nor do we wish to create an untenable system wherein defendants in strict liability cases are deprived of well-established affirmative defenses developed through our common law.

Thus, we conclude that the affirmative defense of compliance with contract specifications is, based on the clear holding of Bloemer, available to defendants such as Neenah in strict products liability actions in Missouri.

C. The trial court did not err in submitting Jury Instruction No. 8.

Having determined that the compliance with contract specifications defense was available to Neenah as an affirmative defense against Hopfer's claims, we must consider whether the trial court erred in submitting Jury Instruction No. 8 to the jury. A defendant is entitled to a jury instruction on any theory that the evidence and the reasonable inferences therefrom, viewed in the light most favorable to the submission of the instruction, tend to establish. Klotz, 311 S.W.3d at 766; Westfall, 75 S.W.3d at 280. Here, viewed in the light most favorable to the giving of Jury Instruction No. 8, sufficient evidence was presented at trial supporting Neenah's

16

defense of compliance with MoDOT's contract specifications. Neenah presented substantial testimony at trial that when manufacturing the grates, originally produced for the 1999 retrofitting project and later used in the Hall Street project, Neenah simply relied on the plans and specifications provided by MoDOT and EDSI. Neenah presented evidence that it had no input as to the design of the two-hole grates and no discretion to deviate from the specified design. While Hopfer presented contrasting testimony regarding Neenah's limited reliance on MoDOT's specifications, as well as Neenah's involvement in the design process for the grates at issue, the trial court was not permitted to weigh the conflicting evidence before submitting Jury Instruction No. 8 to the jury. Instead, conflicting or contradictory evidence presented at trial is a question of fact for the jury to decide. Jablonski v. Barton Mut. Ins. Co., 291 S.W.3d 345, 348 (Mo. App. W.D. 2009). As a result, the trial court properly submitted Jury Instruction No. 8 to the jury.

Whether or not the compliance with contract specifications defense, as applied to Neenah based on the facts of the case, operated to preclude Neenah's liability for Hopfer's injuries was a determination for the jury to make. It was the jury's duty, not the trial court's duty, to consider the evidence presented at trial, weigh the evidence, and then determine the applicability of the affirmative defense. The trial court's role is to submit jury instructions on any theories supported by the evidence. Westfall, 75 S.W.3d at 280. The trial court acted properly in submitting Jury Instruction No. 8 to the jury based on the evidence presented by Neenah at trial of its reliance upon MoDOT's contract specifications.

Because the compliance with contract specifications defense is available to defendants in strict products liability claims in Missouri, and because there was sufficient evidence presented

17

at trial from which a jury could reasonably apply the defense, the trial court did not err in submitting Jury Instruction No. 8 to the jury. Point One is denied.

## II. Point Two – Exclusion of FMEA Evidence

Hopfer argues in Point Two that the trial court erred in excluding evidence that Neenah failed to conduct FMEA testing when designing the grate system.[5] FMEA testing is an analytical process used by manufacturers during the design process to identify and correct potential failures in a product's design. Hopfer sought to offer evidence that Neenah did not perform any FMEA testing during the design process for the grate system. The trial court ruled that FMEA evidence was inadmissible because such evidence was not relevant to the jury's determination of whether the grates were defective, but instead related only to Neenah's conduct in designing the grates, which is not an element to be proved in a strict products liability case. Hopfer maintains that evidence of product design is admissible in a strict products liability case in Missouri under the prudent-manufacturer test; that such evidence would have demonstrated how Neenah's grate system was defectively designed for the foreseeable use of the product; and that the trial court erred disallowing such evidence.

### A. Standard of Review

The admission or exclusion of evidence at trial is within the sound discretion of the trial court. Rankin v. Venator, 93 S.W.3d 814, 819 (Mo. App. E.D. 2002). As a result, the trial court is granted "considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, [the trial court's] action will not be grounds for reversal." Lozano v. BNSF Ry. Co., 421 S.W.3d 448, 451 (Mo. banc 2014). The trial court abuses its discretion when "its ruling is clearly against the logic of the circumstances ... and is so unreasonable and arbitrary

---

[5] Hopfer conceded during oral argument that he should "lose" on his claim in Point Two. For the reasons set forth herein, we reach the same conclusion.

18

that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." Id. If reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion. Id. Moreover, even if the trial court has abused its discretion in excluding evidence, "this Court is loathe to vacate a jury's verdict and resulting judgment on such grounds." Id. Instead, an erroneous evidentiary ruling warrants reversal only when the error "materially affected the merits of the action." Id. at 452.

B. The trial court did not abuse its discretion in excluding the FMEA evidence.

Missouri courts have continually held that "[n]egligence and strict liability cases, though viewed similarly in some jurisdictions, are distinguished in our state." Aronson's Men's Stores, Inc. v. Potter Elec. Signal Co., 632 S.W.2d 472, 474 (Mo. banc 1982); see also Blevins v. Cushman Motors, 551 S.W.2d 602, 608 (Mo. banc 1977) ("the difference between negligence and strict liability in tort in defective design cases is in strict liability we are talking about the condition (dangerousness) of an article which is designed in a particular way, while in negligence we are talking about the reasonableness of the manufacturer's actions in designing and selling the article as he did."). To this end, Missouri courts admonish that in strict liability claims, "the sole subject of inquiry is the defective condition of the product and not the manufacturer's knowledge, negligence or fault." Elmore v. Owens-Illinois, Inc., 673 S.W.2d 434, 438 (Mo. banc 1984). The manufacturer's standard of care in strict liability claims is irrelevant because that standard relates to the reasonableness of the manufacturer's design choice. Id. Consequently, "under strict tort liability, the defendant may be found liable without regard to his knowledge or conduct." Thompson v. Brown & Williamson Tobacco Corp., 207 S.W.3d 76, 107 (Mo. App. W.D. 2006).

19

As a result, the concept of "reasonable care" is excised from Missouri's rule of strict tort liability. Nesselrode, 707 S.W.2d at 375. In other words, "[t]he 'heart and soul' of a strict liability design defect case is unreasonable danger and causation," meaning that a plaintiff "is not required to show that the manufacturer or designer is at fault." Smith v. Brown & Williamson Tobacco Corp., 275 S.W.3d 748, 792 (Mo. App. W.D. 2008) (internal citations omitted). Accordingly, liability may be imposed in a strict liability action "without regard to the defendant's knowledge or conduct." Nesselrode, 707 S.W.2d at 383. Consistent with this approach, under Missouri's rule of strict tort liability, the concept of "unreasonable danger," which is determinative of whether a product is defective, is presented to the jury as an ultimate issue without further definition. Id. at 378. The jury gives the concept of unreasonable danger content by "applying their collective intelligence and experience to the broad evidentiary spectrum of facts and circumstances presented by the parties." Id.

Understanding Missouri's differing evidentiary requirements to prove the separate tort claims of negligence and strict product liability, we hold that the trial court's exclusion of the proffered FMEA evidence was consistent with Missouri's approach to claims of strict liability and did not constitute an abuse of discretion. Evidence of Neenah's decision not to conduct FMEA testing on the grates was evidence relating to Neenah's *conduct* in designing the grates. The choice of whether to perform FMEA testing was a form of conduct by Neenah during the design and manufacturing process. Such evidence could only prove that Neenah did not exercise reasonable care in designing the grates, thereby demonstrating Neenah's allegedly negligent conduct. However, Hopfer did not bring a claim against Neenah based on negligence, but instead asserted only a strict liability claim. As explained, in Missouri, evidence regarding a manufacturer's conduct and reasonable care in designing and manufacturing a product relates

20

solely to that manufacturer's *negligence*, which is not an issue to be submitted to the jury in the strict products liability claim brought by Hopfer. Elmore, 673 S.W.2d at 438; Nesselrode, 707 S.W.2d at 375; Thompson, 207 S.W.3d at 107. The lone relevant inquiry for the jury in this matter was whether the grates were unreasonably dangerous, and therefore defective based solely on the condition of the grates. Neenah's conduct, standard of care, and fault in the manufacturing process is not a relevant consideration for the jury in Hopfer's strict products liability claim.

Missouri courts have openly and consistently articulated a pronounced distinction between products liability claims based on strict liability and negligence, excluding evidence of a defendant's conduct, knowledge, and fault from the former. This view, the Missouri Supreme Court explained in Nesselrode, "comports with the very *raison d'etre* of strict tort liability law," which is concerned only with whether a product is unreasonably dangerous as designed, and not with whether the manufacturer is "at fault," as that concept is employed in the negligence context. Nesselrode, 707 S.W.2d at 383; Elmore, 673. S.W.2d at 438.

Hopfer's argument that the trial court should have applied the prudent-manufacturer test to admit the FMEA evidence at trial changes neither this legal reality nor our holding. In support of his contention that the prudent-manufacturer test standard should have been applied, Hopfer notes that "[c]ases outside of Missouri have effectively applied the test to strict products liability actions." Hopfer invites this Court to expand the boundaries of strict liability analysis to include an application of the prudent-manufacturer test. We decline to do so.

The prudent-manufacturer test states that a product is unreasonably dangerous if a reasonably prudent manufacturer would not have "produced and marketed the product in the condition that it was in at the time that it was placed into the stream of commerce, assuming

21

knowledge of the particular risk of harm on the part of the manufacturer or seller." 86 A.L.R.5th 215. The implicit legal foundation of the prudent-manufacturer test is the notion that the manufacturer's conduct in designing and manufacturing a product is a relevant consideration in a strict products liability case, just as it is in a products liability claim premised on a theory of negligence. See, e.g., Nichols v. Union Underwear Co., Inc., 602 S.W.2d 429, 433 (Ky. 1980) (stating that in design defect cases in Kentucky, where the prudent-manufacturer test is followed, the distinction between claims based on strict liability and negligence "is of no practical significance so far as the standard of conduct required of the defendant is concerned."). Thus, jurisdictions that embrace the prudent-manufacturer test do so based on the conclusion that products liability claims premised on theories of strict liability and negligence should be treated the same. As noted, however, Missouri strongly rejects this approach and distinguishes products liability claims premised on strict liability from those based on negligence.

Further, Hopfer has not provided, nor has our own research produced, any authority indicating that Missouri courts have ever viewed the prudent-manufacturer test favorably, much less adopted it. Missouri case law directly addressing the applicability of the prudent-manufacturer test is virtually non-existent. As a result, no Missouri court has explicitly adopted or rejected the prudent-manufacturer test.[6] We find no support or guidance that leads us to conclude that the prudent-manufacturer test has been adopted in Missouri. To the contrary, we are guided by Missouri's repeated direction and approach to strict products liability jurisprudence which fundamentally departs from the expanded analysis strict tort liability under the prudent-manufacturer test adopted in other jurisdictions. We are not persuaded that applying the prudent-manufacturer analysis in this case would comport with existing strict products

---

[6] Although Nesselrode does not expressly reject the prudent-manufacturer test, we note the dissenting opinion confirms that it was *not* adopted in Missouri at that time: "Although not yet introduced into our law, it may well be that the prudent-manufacturer test… is the better reasoned approach." Nesselrode, 707 S.W.2d at 393.

22

liability jurisprudence in Missouri, and decline to expand the law of strict products liability beyond its well-established parameters.[7]

Because the FMEA evidence was evidence of Neenah's conduct, a consideration not at issue in a strict products liability case, the trial court did not abuse its discretion in excluding the FMEA evidence at trial. Point Two is denied.

### Conclusion

The trial court did not abuse its discretion in denying Hopfer's motion for new trial. The judgment of the trial court is affirmed.

_____
KURT S. ODENWALD, Judge

Sherri B. Sullivan, P.J., concurs.
Patricia L. Cohen, J., concurs.

---

[7] We note further that the jury's verdict is consistent with a factual finding that Neenah merely adhered to MoDOT's design and contract specifications for the grates it manufactured for MoDOT's road project. Inasmuch as Neenah was found by the jury to have followed MoDOT's contract specifications, Neenah's performance or non-performance of FMEA testing is not relevant on the issue of Neenah's liability for a design defect under Hopfer's strict products liability claim, which was the only claim pursued by Hopfer at trial. Evidence of whether Neenah conducted FMEA testing might very well be relevant and admissible for a jury's consideration on a claim of negligence, which Hopfer did not pursue against Neenah at trial.